**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:  PATSY CATANZARETI,

              Debtor.

Chapter 11
Case No.  08-11370 (RTL)

- - - - - - - - - - - - - - - - - - - - - - - - -X

PATSY CATANZARETI,

               Plaintiff,

      v.

Adversary Proceeding
No. 08-1472 (RTL)

KENNETH S. PIZZO, SR.

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**
Richard D. Trenk, Esq.
Trenk, DiPasquale, Webster, Della Fera & Sodono, P.C.
Attorneys for Plaintiff

Gerald E. Arth, Esq.
Eric E. Reed, Esq.
Fox Rothschild, LLP
Attorneys for Defendant

**RAYMOND T. LYONS, U.S.B.J.**

**INTRODUCTION**

Plaintiff's land was condemned by the municipality to prevent its development for

residences.  Defendant, as contract purchaser, claims the condemnation proceeds should go to

him because he was prepared to accept title before the town condemned.  The contract provides

that condemnation proceeds belong to the Seller. The Buyer did not validly demand an early

closing. There is no reason to deprive the Plaintiff of his right to the condemnation proceeds

under the contract. The court grants Plaintiff's request for judgment declaring that the

condemnation proceeds belong to him and that Defendant's unsecured claim is disallowed.

## JURISDICTION

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28

U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the

District of New Jersey dated July 23, 1984, referring all proceedings related to cases under Title

11 of the United States Code to the bankruptcy court. Plaintiff has alleged, and Defendant has

admitted, that this is a core proceeding. They are deemed to have consented to the bankruptcy

court entering judgment subject to appeal pursuant to 28 U.S.C. § 157(c)(2).

## FINDINGS OF FACT AND PROCEDURAL HISTORY

Pat Catanzareti ("Plaintiff/Seller/Debtor") has been trying to develop an old farm for

residences, including some low and moderate income housing, for more than twenty years. The

municipality vigorously opposed the development. Catanzareti sued the town and won a

judgment approving his development applications and designation by the Council On Affordable

Housing ("COAH"). Both the judgment and agency decision were affirmed on appeal. After

failing to block development, and suffering criticism by the courts, the town resorted to eminent

domain to prevent Catanzareti from building. Because of the Defendant's claim that Catanzareti

failed to diligently prosecute the applications for governmental approvals, it is important to

understand the long, arduous gauntlet that the town made Catanzareti run to get approvals.

Catanzareti bought an 86 acre farm in 1983. He is a real estate sales person and holds a

broker's license.  Prior to buying the farm he had bought isolated lots and built single family

houses, but he had never tackled a major subdivision.  After acquiring the farm, he joined an

action by a neighbor to have the town designate their properties for low and moderate income

housing to fulfill the town's constitutional requirement.  It took four years and a court-ordered

mediation by COAH to reach a settlement in 1988 designating Catanzareti's property for

development of 170 residences, 34 of which would be reserved for low and moderate income

residents.

A ban on new construction because of inadequate sewer capacity delayed the project for

six years.  As Phase I, Catanzareti applied for and received approval relatively quickly in 1994

for 32 market rate single family homes.  He sold the land with approvals to a company owned by

the Defendant, Kenneth S. Pizzo, Sr.  Pizzo built and sold the homes.

In 1995, Catanzareti proceeded to address the balance of his land (Phase II).  He

contracted with Pizzo again on May 5, 1995, to sell Phase II after all governmental approvals

were in place.  The Phase II subdivision plan called for 104 market rate single family homes and

34 low/moderate income apartment flats.  The application for preliminary subdivision approval

was filed with the local planning board on August 3, 1998.  Elected officials publicly voiced

their opposition to the proposal citing concern for overburdening local schools and roads.

The first of a long series of acts by the town to prevent or delay Catanzareti was the

planning board's refusal to consider his application complete.  Catanzareti sued in state court on

October 7, 1998.  The board also required an environmental impact statement.  Catanzareti

challenged that in court by amended Complaint dated June 2, 1999.  After two years, the state

court ruled for Catanzareti and ordered the planning board to commence hearings on the

subdivision by January 15, 2001.  Not only did the town fail to meet the court-imposed deadline,

it denied the application in December 2001.

Catanzareti returned to state court.  Nearly three years after the planning board denial,

and after enlisting a special master, on November 15, 2004, the state trial court awarded a

judgment in favor of Catanzareti granting him preliminary subdivision approval for Phase II and

preliminary site plan approval for the low/moderate income housing portion.  The court

described the town as "recalcitrant" and "often outright hostile" to Catanzareti's project.  The

town appealed to the Appellate Division of state court.

In the meantime, in 2001, the town applied to COAH (COAH I) to remove Catanzareti's

property from the low/moderate income housing designation.  COAH denied the request.  The

town appealed that agency decision to the Appellate Division of state court as well.  In 2005, the

town made a second application to COAH (COAH II) regarding Catanzareti's property.  Again

COAH ruled against the town.  The town appealed COAH II.

On April 25, 2006, the Appellate Division heard arguments on the town's appeal of the

trial court judgment granting preliminary approval and the town's appeal of COAH I.  The

Appellate Division ruled for Catanzareti on both appeals.  Its written opinions are dated June 5,

2006.  The first opinion recites in detail the excruciating history of Catanzareti's mistreatment by

the town.

> The Board's conduct was starkly inconsistent with its promise, in
> the COAH settlement, to "fast track" Catanzareti's application to
> develop the property. [footnote omitted]
>
> . . . .
>
>   Finally, we note that the majority of the Board's reasons for
> rejecting the application either have no basis in its zoning

> ordinances, are contrary to the terms of the 1988 COAH
> settlement, or appear pretextual. . . .
>
>          In 1988, the Borough agreed to let Catanzareti build
> affordable housing on his land. Almost twenty years later, the
> affordable housing has not been built.  We agree with Judge
> Mahon that the Board was arbitrary and capricious in its reasons
> for denying the application.  The Board also acted arbitrarily and
> inconsistently with its obligations under the COAH settlement in
> denying the application rather than in approving it with conditions.
> In light of the tortured history of this case and the companion
> COAH case, we find no error in Judge Mahon's decision to
> approve Catanzareti's land use application with conditions.

*Catanzareti v. Borough . . .* , No. A-2093-04T2, 2006 WL 1520274,*8-9 (N.J. Super. Ct. App.
Div. 2006).
In the second opinion, the Appellate Division pointed out that the COAH II appeal was pending

but not part of its determination at that time.

>          Further, a significant amount of the delay in developing the
> site is attributable to the Borough's stalling tactics.  In a related
> case, *Catanzareti v. Borough [  ]*, Judge Mahon ordered the
> Borough to approve Catanzareti's preliminary subdivision
> approval for the site.  His decision concluded that the Borough had
> intentionally and repeatedly delayed Catanzareti's efforts to build
> the affordable units.  In a separate opinion, we affirmed Judge
> Mahon's decision.

*In re Borough . . . Grant of Substantive Certification*, No. A-0913-04T2, 2006 W.L. 1520263, *4
(N.J. Super. Ct. App. Div. 2006).

The town did not appeal to the N.J. Supreme Court.

     Catanzareti applied to the state Department of Environmental Protection (DEP) for

wetlands and sewer permits.  A counter signature by the town official was required.  The official

failed to sign the application.  Again, Catanzareti returned to state court.  After several months,

the town capitulated.  The DEP wetlands and sewer permits were issued on December 22, 2006.

     The COAH II appeal was decided in Catanzareti's favor on May 22, 2007.  The town

failed to appeal to the New Jersey Supreme Court.  With all litigation against the town finished,

Catanzareti had the engineering completed and filed an application for final subdivision approval

on August 25, 2007.  The planning board voted to grant final approval in January 2008.  It never

memorialized the approval in a written resolution.

### *Phase II Contract - Pizzo/Catanzareti*

While Phase I was being built and sold, Pizzo and Catanzareti signed a contract for Phase

II on May 5, 1995.  It called for Catanzareti to obtain all governmental approvals.  The price was

calculated at $40,000 per lot.  The contract set a three year deadline for obtaining approvals with

a maximum two year extension if an application or litigation was pending.  After five years

either party could terminate the contract.

When the five years was up in 2000, Catanzareti was in litigation with the town.  Not

even one planning board meeting had been held.  Only after the court ordered the planning board

to consider the application did the board take it up during 2001.  Meanwhile, a dispute arose

between Catanzareti and Pizzo concerning, *inter alia*, the price per lot in light of the inflation in

land values since 1995.  Catanzareti sent a letter terminating the contract.  Pizzo started an action

in the state court on May 7, 2001.  That action was settled when Pizzo and Catanzareti signed an

amended contract for Phase II on January 9, 2003.

The 2003 contract tracked the 1995 contract in most respects.  The significant changes

were:

> 1.  The price per lot was increased to $50,000 but since the
> subdivision map submitted by Catanzareti (defined as the
> "Submitted Plans") had 104 lots of varying size and terrain, a
> separate formula was specified in the event the Submitted Plans
> were approved.  If the Submitted Plans were "deemed approved"
> the total purchase price would be $4,635,000.

6

2.  The amount Pizzo agreed to advance, interest free, to pay development costs including engineering and legal fees, increased from $450,000 to $750,000.

3.  The time period to obtain approvals was four years but would be extended if either applications for governmental approvals or litigation affecting the development were pending.  There was no outside limit.

4.  If fewer than 70 lots received approval, Pizzo had the option to buy the property at a fixed price of $3.5 million; i.e., the formula to determine price based on the number of approved lots would not apply in that event.

Both the 2003 and 1995 contracts had a condemnation clause.  That provision remained the same in each contract, except for a three-word change that is not significant.  Paragraph 11 of the contract provides that condemnation proceeds belong to the Seller.  In the event of a partial taking, the Buyer would purchase the balance of the property with the price calculated on the number of approved lots.[1]

---

[1]  **11.  CONDEMNATION.**  Seller represents that it has no knowledge of any action or proceeding, either contemplated or pending, for condemnation of the Premises, or any portion thereof.  Seller shall give Buyer prompt written notice of any such proceeding or action of which it becomes aware.  Buyer will have the option of participating in such proceedings, at its cost and expense.  Should all or any material portion of the Premises to be conveyed be taken by condemnation or eminent domain prior to closing of title, this Agreement may be terminated by the election of Buyer, by sending written notice to Seller within five days after the vesting of title in the condemnation authority.  In the event of such termination by Buyer, this Agreement shall be null and void, and the Advance shall be returned to Buyer.  If Buyer does not elect to so terminate and the condemnation has resulted in the loss of any Lots, then Seller shall be entitled to any condemnation rewards or recoveries and the Purchase Price payable to Seller hereunder shall be based upon the number of Lots remaining after such condemnation.  For purposes of the preceding sentence, a Lot shall be deemed to have been taken if the entire Lot has been taken or so much has been taken that the remaining portion would not be a legal building lot under the then current requirements of the zone in which the Premises is located.  If Buyer does not elect to terminate the Agreement and only a portion of any Lots has been taken and each of the affected Lots continues to be a legal lot after the condemnation, then the Seller shall assign to the Buyer all condemnation awards or recoveries in connection therewith.

Pizzo was anxious to get started on Phase II as soon as Phase I was completed. His frustration grew with every delay, but he recognized that this was due to the roadblocks thrown in the way by the town. He characterized the town's treatment of Catanzareti as torture. Pizzo testified that Catanzareti's lawyer, a mild-mannered professional, often defused his frustration. One example of that was an exchange of correspondence in 2006.

Pizzo complained to Catanzareti that the approval process was not moving. At that time, the Appellate Division had under consideration the two appeals: (i) the trial court judgment granting preliminary approvals and (ii) COAH's denial of the town's application to alter the low/moderate income housing designation.[2] In addition, the town official had not countersigned the DEP wetlands and sewer application. Catanzareti's lawyer wrote to Pizzo on May 16, 2006. Pizzo responded by letter dated May 24, 2006: "I was not suggesting that we do anything at all until we have the decision of the Appellate Court and the approvals of the DEP."

### _Condemnation_

The four witnesses who testified at trial concurred that acquisition of the property in question, either contractually or by eminent domain, is an arrow in the quiver of a municipality that opposes development. The town broached acquisition with Catanzareti as early as September 28, 1998, when the town attorney wrote to Catanzareti's attorney inquiring about a voluntary sale. He was rebuffed by Catanzareti's lawyer who pointed out that the property was already under contract to Pizzo. A copy of that letter was sent to Pizzo and his lawyer. Thus, early in this game everyone knew that acquisition by the town was not only an available strategy

---

[2] Also, pending was the COAH II appeal that was not ready for consideration in the Appellate Division.

for the town, but actively considered.  However, none of the parties considered condemnation as a viable option because they thought it was too expensive for a small town of only 3,800 residents.  Pizzo colorfully testified about his assessment of the likelihood of condemnation, "Never in two million years."

The subject of acquisition popped up from time to time during the long, arduous litigation in state court.  In a hearing before the state court on September 1, 2005, Catanzareti's lawyer characterized threatened condemnation as one of the shenanigans used by the town to thwart development.   He asked the state court to order the town to either condemn the property by a date certain or forebear condemning the project.  The town represented that it had done nothing towards condemnation.  The court denied the request as premature.  Pizzo attended that hearing in court and was aware of Catanzareti's request regarding condemnation.  Pizzo did not consider condemnation as a serious issue at that time.

Despite its representations to the court that it had taken no action towards condemnation, a week after appearing in court, on September 8, 2005, the town passed an ordinance to appraise the property and condemn it "if the Borough can fund the purchase."  A bond ordinance dated April 13, 2006, appropriated $979,000 to acquire the property through condemnation.  This amount was clearly inadequate and demonstrated that the town was not seriously pursuing condemnation.  Two appraisers retained by the town made an appointment to inspect the property on April 26, 2006.  Catanzareti met the appraisers and two town attorneys at the site. He did not inform Pizzo of this meeting.  Coincidentally, the argument before the Appellate Division was held on April 25, 2006.  Both Catanzareti and Pizzo attended, but Catanzareti did not mention that he had an appointment with the appraisers the next day.  Catanzareti did not

regard the town as seriously pursuing condemnation.

The appraisals were not made public, nor given to Catanzareti, but a local paper published an article on September 21, 2006, stating that the appraised value was $8 million. Catanzareti saw the article and concluded that the town would never be able to raise that much money. Pizzo did not see the article but learned about it from an associate sometime after publication.

Special eminent domain counsel for the town wrote to Catanzareti's lawyer on October 3, 2006, advising that "the Borough Council has not authorized us to proceed with a formal offer; however, the Borough is prepared to negotiate with your client regarding possible acquisition." The Borough offered to send copies of the appraisals subject to a confidentiality and hold harmless agreement. Pizzo did not receive notice of this letter. Catanzareti's lawyer again rebuffed the town's overtures. In a strongly worded letter dated October 9, 2006, he informed the town:

1. Catanzareti may challenge the town's right to condemn in light of the judgment awarding preliminary approvals that was affirmed on appeal and the COAH settlement.

2. Catanzareti was under contract to Pizzo and intended to honor it.

3. If the town wished to acquire the property it should proceed formally under the Eminent Domain Act.

Pizzo did not receive a copy of this letter. Shortly thereafter, Pizzo wrote and questioned whether Catanzareti was cooperating with the town to have a complete taking and "wash me out of the deal." Pizzo tried, without success, to obtain copies of the appraisals from the town. By early 2007, after the new Mayor took office, the possibility of condemnation seemed less remote.

10

Catanzareti's lawyer wrote to Pizzo's lawyer on February 22, 2007:

> The project is now ready to be submitted for final
> subdivision approval, but we have been concerned with statements
> made by the Borough of High Bridge officials to the affect that the
> Borough intends to take the property by Eminent Domain. Mr.
> Pizzo has been well aware of this pending condemnation. We
> understand that Mr. Pizzo has been attempting to get copies of the
> appraisal completed by High Bridge on the subject property. By
> coincidence, your letter was received by me as was the enclosed
> letter dated February 15, 2007 from Mr. Apgar, the Borough
> attorney. The receipt of this letter increases the importance of
> deciding on our mutual next course of action.

On February 23, 2007, town officials met with Catanzareti.  The town attorney delivered

a letter to Catanzareti together with copies of the two appraisals, offering to purchase the

property for the lower appraisal value, and demanding a response within 5 business days.  In

conclusion, the letter stated, "This offer is of course subject to adequate acquisition financing . . .

."  Catanzareti's lawyer forwarded this letter but not the appraisals, to Pizzo and his lawyer.

Pizzo made independent inquiries in March 2007 and concluded that the town did not have the

resources to fund an acquisition.

Catanzareti did not accept the town's offer for two reasons: (i) the offer was contingent

on financing and Catanzareti believed the town could not raise the money; (ii) he was under

contract with Pizzo and could not convey title to the town without Pizzo's consent.  Catanzareti

and his lawyer approached the town about a tripartite settlement whereby the town would take

part of the property and Pizzo could build on the remainder, including low/moderate income

housing.  Pizzo participated in settlement negotiations with the town.

Pizzo, meanwhile, embarked on an all-out effort to convince the town not to condemn the

property.  He learned from town officials that a major concern with Phase II was overburdening

11

the school system.  Pizzo suggested alternate development schemes that he contended would result in fewer school-age children.  A vocal group of local residents organized to oppose the condemnation citing the debt burden for bonding the $8 million price and the loss of revenue by turning a tax ratable into public open space.  Pizzo joined forces with this citizens' group.  They produced a video interview of concerned citizens that included Pizzo describing his alternate development possibilities.

Because of the conflict among the citizenry, the town took the unusual step of holding a referendum on the condemnation.  Pizzo spoke out at the a public meeting against the condemnation and presented some drawings showing how the property could be developed using less land, with the excess being gifted to the town.  He urged the town to postpone the referendum.  The town went ahead and the referendum passed by a narrow margin in August 2007.

Following the vote, the town filed a complaint in state court initiating formal condemnation proceedings on September 5, 2007.  It still did not have the money for the acquisition.  Pizzo was named as a defendant and challenged the towns right to condemn.  The trial court ruled against him.  He appealed but later withdrew the appeal.

Catanzareti did not oppose the condemnation or contest valuation.  On April 24, 2008, Condemnation Commissioners appointed by the court fixed the value of $7,885,261 based solely on the town's appraisals.  The town had not yet posted the money, so Catanzareti petitioned the court to set a date by which the town had to take the property or abandon the condemnation.  On the last date fixed by the court, May 27, 2008, the town filed a declaration of taking that transferred title from Catanzareti to the town.  On June 13, 2008, the town paid the

condemnation award plus interest to Catanzareti.

### *Demand for Closing*

In the late Fall of 2006, after the article in the local paper disclosed the $8 million appraisal value, Pizzo realized that his assessment that the town would not condemn this property in two million years, was perhaps overstated; he became concerned that Catanzareti might be tempted by the high value and cooperate with the town resulting in Pizzo being "washed out of the deal."  Pizzo wrote a letter to Catanzareti dated December 20, 2006, stating that he was "ready, willing, and able to take title 'as is' sometime next month . . . ."  He followed up with a second letter dated January 4, 2007.[3]

On February 14, 2007, Pizzo's lawyer wrote to Catanzareti and his lawyer that Pizzo "will waive all of the preconditions except title and therefore is prepared to settle on the 6th day of March 2007."  He also asserted that Pizzo had been damaged by Catanzareti's lack of diligence and would reserve his claims.  Catanzareti's lawyer responded on February 22, 2007, asserting that the contract had expired (presumably because more than four years had passed since it was signed on January 9, 2003).  Without prejudice to that legal position, Catanzareti's lawyer wrote:

> Mr. Catanzareti is willing to give consideration to Mr. Pizzo's
> proposal to close title promptly, but your letter does not
> clarify important terms concerning such a closing. Would you please
> confirm that your letter intends a closing of title at which:
>
> 1. General releases would be exchanged between the parties; and

---

[3] Catanzareti denies receiving either letter and accuses Pizzo of fabricating them.  Pizzo did not send a copy of either letter to Catanzareti's lawyer, as he did on virtually all other correspondence.  The court does not see a need to resolve this factual dispute.

2. The purchase price would be $5,200,000.00 (104 marketable lots x $50,000.00), subject only to normal adjustments for back taxes.

If you will confirm these details, Mr. Catanzareti will respond to Mr. Pizzo's offer promptly.

Pizzo's lawyer wrote back on March 1, 2007:

The approval contingencies as to the sub division is for the benefit of the buyer, the buyer clearly has a right to waive said contingencies. Furthermore the base price and anything more than that is contingent upon a "final major sub-division approval for not less than 70 lots plus the Mount Laurel Land" etc., etc.( SEE PARA 5.1 on pages 7 & 8 in the contract of sale).Clearly there are no finally approved lots and no map has been filed.  Clearly the actual development of the property may be very far away.

Catanzareti's lawyer wrote back on March 9, 2007:

Mr. Catanzareti and I are simply bewildered by the content of your March 1, 2007 letter.  You had previously written indicating that Mr. Pizzo wished to close title immediately, and was waiving all preconditions to closing. I responded by letter to you dated February 22, 2007 seeking to clarify two points which are fundamental to a possible closing. Your March 1st letter did not respond to either of my questions, so I will repeat them:
1.  Is your client prepared to exchange general releases at the closing?
2.  Is the purchase price to be $5,200,000.00 (104 market lots x $50,000.00)?

On March 14, 2007, Pizzo's lawyer wrote back:

In response to your Mach 9, 2007 letter, I will respond to your questions in seriatim as follows:

1.  My client will exchange mutual releases.

2.  My client's position is clear and that is at this point there are no approvals and under the Agreement of Sale he has the right to close in accordance with that Agreement in the amount of $3,500,000.00.

14

Shortly thereafter, Pizzo filed a complaint for specific performance in the state court on March 26, 2007. His motion for summary judgment was denied by the state court on October 19, 2007. Neither party sought arbitration of any issues despite an arbitration clause in the contract. Pizzo joined the town as a defendant in the state court litigation asserting damages under various theories. That litigation was stayed against Catanzareti when he filed bankruptcy. The remedy of specific performance became moot once the town took title. Apparently, the suit against the town is still pending in state court but has not been prosecuted by Pizzo.

### *Bankruptcy*

Catanzareti filed a voluntary petition under chapter 11 of the Bankruptcy Code on January 27, 2008. He was granted relief form the automatic stay to return to state court and ask that the town be ordered to either complete the condemnation or abandon it. When it was finally clear that his property would be condemned, he filed a plan of reorganization to pay all claims in full. His plan was confirmed and all claims have been paid in full, except for Pizzo's disputed unsecured claim. Pizzo's secured claim of approximately $750,000 was paid and sufficient funds are in escrow to pay Pizzo's unsecured claim if allowed.

## DISCUSSION

### *Principles of Contract Interpretation and Construction*

> In the interpretation, and ultimately, in the construction of contracts as well, the avowed purpose and primary function of the court is to ascertain the intention of the parties. The fundamental and cardinal rule is that the intention of the parties is to be ascertained as of the time they executed the contract, and effect is to be given to that intention if it can be done consistently with legal principles . . .

> Whatever may be the inaccuracy of expression or the inaptness of the words used in an instrument from a legal perspective, if the intention of the parties can be clearly discovered, the court will

15

give effect to it and construe the words accordingly.

11 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 30.2, at 25 (4th ed. 1999) (internal citations

omitted).  The parties agree that New Jersey substantive law governs this adversary proceeding.

> Under the law of New Jersey, the central query in the construction of contracts is the intent of the parties.  It is not necessarily the parties' true intent, but the intent as expressed or apparent in the writing, that controls.  Where the contract is clear and unambiguous, the determination of the parties intent is purely a question of law within the exclusive province of the trial court.

*J.I. Hass Co. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir. 1989), *cert. denied*, 493 U.S. 1080

(1990).

> The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them.  To this end, the language used must be interpreted "in accord with justice and common sense." . . . .
>
> In the quest for the common intention of the parties to a contract the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain. An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose.
>
> . . . .
>
> However, "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction" and the courts must enforce those terms as written.  The court has no right "to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently." Nor may the courts remake a contract better than the parties themselves have seen fit to enter into, or to alter it for the benefit of one party to the detriment of the other.

*Sons of Thunder, Inc. v. Borden, Inc.*, 666 A.2d 549, 559 (N.J. Super. Ct. App. Div. 1995), *rev'd*

*on other grounds,* 690 A.2d 575 (1997).

Paragraph 11 of the January 9, 2003 contract allocates condemnation proceeds to the

16

Seller, Catanzareti.

> . . . Should all or any material portion of the Premises to be
> conveyed be taken by condemnation or eminent domain prior to
> closing of title, this Agreement may be terminated by the election
> of Buyer, by sending written notice to Seller within five days after
> the vesting of title in the condemnation authority.  In the event of
> such termination by Buyer, this Agreement shall be null and void,
> and the Advance shall be returned to Buyer.  If Buyer does not
> elect to so terminate and the condemnation has resulted in the loss
> of any Lots, then Seller shall be entitled to any condemnation
> rewards or recoveries and the Purchase Price payable to Seller
> hereunder shall be based upon the number of Lots remaining after
> such condemnation. . . .

Since the town took the entire property in question there was nothing left for Pizzo to purchase.  The money Pizzo advanced has been repaid to him.  That would seem to end the analysis, but Pizzo asserts various theories why Catanzareti should be precluded from relying on Paragraph 11.  The court will review each of Pizzo's contentions keeping in mind the court's role is to determine the intention of the parties from the words of the contract read in context of the relation of the parties and the attendant circumstances.

### *Demand to Close*

Pizzo claims that Catanzareti was obligated to convey title to him on March 6, 2007, for a price of $3.5 million after his lawyer made a demand in his February 14, 2007 letter.  If Catanzareti had conveyed title, Pizzo argues, he would have owned the property when the town took it and would have received the condemnation proceeds.  In opposition, Catanzareti denies he was obligated to close before completing the approval process.  He also asserts that Pizzo's demand was not effective to give rise to a breach and, in any event, the price of $3.5 million was not correct.

### *Price*

The court finds the last argument persuasive.  The contract was set up so that the

purchase price was a function of the number of approved lots.  In 1995, the price was $40,000

per lot and in 2003, that was amended to $50,000 per lot.  In 1995, when the price was first set,

the parties knew that the COAH settlement established a maximum of 170 dwelling units with 34

reserved for low/moderate income housing units.  Phase I took 32 market rate units, leaving a

balance of 104 market rate and 34 low/moderate.  However, no subdivision plan had been

engineered in 1995.  By 2003, the subdivision plan had been presented to the planning board; the

state court found the application complete and ordered the town to hold hearings; the planning

board denied the application; and Catanzareti had gone back to state court seeking reversal of the

board's decision.

So in 2003, when they settled Pizzo's first state court suit, they knew that Catanzareti's

subdivision plan called for the maximum 104 market rate lots plus the low/moderate income

housing units.  In fact, the 2003 contract has a defined term "Submitted Plans".  They knew the

sizes of the lots on the Submitted Plans and agreed that some lots were more valuable than others

based on size, topography and location.  They set a schedule of values for the various lots so that

if the Submitted Plans were approved (as they ultimately were), the total purchase price would

be $4,635,000.  Both parties favored approval for as many lots as feasible;  Catanzareti to obtain

the maximum price and Pizzo to achieve economies of scale in building.  In recognition of their

joint interest, paragraph 20.2 of the 2003 contract provides:

> **20.2**  In connection with an attempt to settle the Litigation, Seller
> and Buyer shall jointly submit a proposal that includes 70 Lots or
> greater to the Borough.  Seller and Buyer agree to keep
> confidential the minimum number of 70 Lots, and the parties agree

that the pursuit of any application will have the goal of maximizing
the total amount of Lots that can be approved at the Premises.

Being realistic, the parties recognized that the Submitted Plans might not be approved for

the maximum number of lots.  Pizzo did not want to be obligated to buy if fewer than 70 lots

received approval; however, he wanted the option to buy the property even if fewer than 70 lots

were approved.  If he exercised that option, the price would be $3.5 million.  But, that option to

purchase at a minimum price of $3.5 million envisioned that the approval process and all

litigation had been completed and that fewer than 70 lots received final approval.

Pizzo argues that the contract specifically states that all contingencies are for his benefit

and gives him the right to waive any contingencies.  Further, obtaining governmental approvals

is one of the contingencies that he could waive.  Since no final approvals had been obtained

when he waived all contingencies, the purchase price should be determined as if fewer than 70

lots were approved; i.e. $3.5 million.  In other words, argues Pizzo, he had the right at any time

up until all governmental approvals had been obtained to waive that contingency and obtain title

for the floor price of $3.5 million.

The incongruity of that position is demonstrated by a concession made by both Pizzo and

his lawyer during cross examination.  Each witness was asked if their interpretation of the

contract would allow Pizzo to wait for Catanzareti to expend all the time and expense to obtain

the maximum number of lots (and the highest price) and then, just before the last approval

document was signed, to waive the approvals contingency and acquire title for the minimum

price of $3.5 million.  Both Pizzo and his lawyer testified that they interpreted the contract to

give Pizzo the right to do that, but he would not exercise his option because it would not be

morally or ethically right or it might breach a duty of good faith and fair dealings.

19

One must keep in mind that in March 2007, when Pizzo wanted to close, Catanzareti had been prosecuting the Phase II application for nearly nine years; he had a state court judgment granting preliminary major subdivision approval and site plan approval for the low/moderate income housing units; the DEP had granted wetlands and sewer permits and the Appellate Division had ruled in his favor on the COAH I appeal. Although the COAH II appeal was pending at that time, it was decided in Catanzareti's favor two months later. He then proceeded to file for final major subdivision approval and final site plan approval, both of which the planning board voted to approve in January 2008, ten months after Pizzo's proposed closing date, March 6, 2007. This whole process cost Catanzareti well in excess of a million dollars.

In other words, when Pizzo set a closing date of March 2007, Catanzareti was in the ninth year of a ten-year struggle to get approval for Phase II and had exhausted not only the $750,000 advanced by Pizzo but several hundred thousand dollars of his money. If it would be immoral, unethical and a breach of the duty of good faith and fair dealing to waive the approval condition just prior to the final approvals being signed, it would be so under these circumstances.

But this merely illustrates the fallacy of Pizzo's suggested contract interpretation. The court finds that Pizzo's interpretation is incorrect. The intent of the parties was not that Pizzo could waive the approval contingency and close at the floor price of $3.5 million. That price pertained only to the situation where the approval process and all litigation had been completed and the number of approved lots was less than 70.

Pizzo cites Paragraph 1.1.2 of the 2003 Contract for his right to purchase the property for $3.5 million. That sections reads:

> **1.1.2** Buyer and Seller agree that Buyer's obligation to close
> hereunder shall be contingent upon the receipt of final subdivision

20

> approval for at least 70 Lots of the size of the Basic Lots.  If fewer
> than 70 Basic Lots receive final subdivision approval, Buyer shall
> have the right, at his sole discretion, to terminate this Agreement
> and the Deposit shall be returned to Buyer in accordance with
> paragraph 1.2.1 hereof.  If fewer than 70 Basic Lots receive final
> subdivision approval, but Buyer elects to proceed with Closing,
> Buyer agrees to pay the Purchase Price of $3,500,000 (as if 70
> Basic Lots had been approved), but, if applicable, subject to the
> per square foot reduction provided for in the last sentence of
> paragraph 1.1.1 hereof.

According to Pizzo, since no lots had received final approval as of March 6, 2007, his

proposed closing date, he had the right to buy the property at the minimum price.  However, as is

explained below, once Catanzareti prevailed in the Litigation, that original Paragraph 1.1.2 was

replaced and no longer applied.

### *Parsing the Contract*

The 2003 Contract has a convoluted structure.  Paragraph 1.1.1 sets the price at $50,000

per approved lot.  Paragraph 1.1.2 provided that if fewer than 70 lots received final approval,

Buyer has the option to terminate the contract or to purchase the property for $3.5 million "(as if

70 Basic Lots had been approved)."

However, Paragraph 20.8[4] provides that Paragraphs 1.1.1 and 1.1.2 would be replaced

---

[4] **20.8**  If (a) no final settlement of the Litigation is reached among the parties hereto and
the Borough, or (b) a judgment in the Litigation consistent with the provisions of either
paragraph 20.2 or the provisions of replacement  paragraphs 1.1.1 et. seq. set forth below is not
obtained, or (c) the Litigation is dismissed or otherwise not pursued and an application consistent
with the provisions of paragraph 20.2 or the provisions of replacement paragraphs 1.1.1 et. seq.
set below is not approved as to above, after the 4 years from the date of execution of this
Agreement (as it may be extended pursuant to paragraph 5.6 hereof) provided for in this
Agreement, either of Buyer or Seller shall have the right to terminate this Agreement, the
Advance shall be returned to Buyer as provided herein unless Buyer determines, in its sole
discretion to purchase the Property for $3,500,000.00 in spite of the failure of any of the events
in subparagraph a-c to occur within the time set forth in this paragraph.  Furthermore, if Seller
prevails in the Litigation with the Township so that Seller's plans and other submissions that are

under certain circumstances.  The second part of Paragraph 20.8 provides, "Furthermore, if

Seller prevails in the Litigation with the Township so that Seller's plans and other submissions

that are the subject matter of the Litigation (the "Submitted Plans") are deemed approved, then

the provisions of Paragraphs 1.1.1, 1.1.2, 1.1.3, 1.1.4 hereof, shall be replaced in their entirety . .

. ."  When the contract was signed on January 9, 2003, Catanzareti had taken his subdivision

plan with 104 single family lots and 34 low/moderate income housing units (the "Submitted

Plans") through the planning board that had denied the application on December 17, 2001.  He

then sued to reverse that decision (the Litigation).  That Litigation was pending in the trial court

when the contract was signed on January 9, 2003.  Pizzo and Catanzareti did not know how that

Litigation would come out so they tried to anticipate the possible outcomes.  As it turns out,

Catanzareti did prevail in the Litigation.  On November 15, 2004, the trial court awarded him a

judgment reversing the planning board and granting preliminary subdivision and site plan

approval.  That judgment was affirmed by the Appellate Division on June 5, 2006.

     This second part of Paragraph 20.8 has two key provisions: (i) "if Seller prevails in the

---

the subject matter of the Litigation (the "Submitted Plans") are deemed approved, then the
provisions of paragraphs 1.1.1, 1.1.2, 1.1.3 and 1.1.4 hereof, shall be replaced in their entirety
with the following:

1.1.1.  Buyer agrees to pay and Seller agrees to accept as the purchase price (the "Purchase
Price") as follows.  The Submitted Plans provide for 104 Lots, consisting of 23 Lots having a
frontage of 70 feet or greater and containing approximately 7,000 to 10,000 square feet each (the
"First Lots"), 17 Lots having front entranceway garage underneath the first floor or basement
with dimensions of approximately 55 feet by 100 feet (the "Second Lots"), and 64 Lots having
dimensions of approximately 50 feet by 100 feet (the "Third Lots").  The portion of the Purchase
Price for the First Lots shall be 23 x $50,000 each, for a total for the First Lots of $1,150,000.
The portion of the Purchase Price for the Second Lots shall be 17 x $45,000 each, for a total for
the Second Lots of $765,000.  The portion of the Purchase Price for the Third Lots shall be 64 x
$42,500, for a total for the Third Lots of $2,448,000; for a total Purchase Price of $4,635,000.

22

Litigation" and (ii) "(the 'Submitted Plans') are deemed approved.  As of the closing date

demanded by Pizzo (March 6, 2007), provision (i) had occurred.  Catanzareti had his judgment,

it was affirmed by the Appellate Division, and the town did not appeal to the Supreme Court of

New Jersey.  The Litigation was over.  Catanzareti had prevailed.[5]  As to provision (ii), the

Submitted Plans were approved by the court for preliminary subdivision and site plan.  Does this

amount to "deemed approved" in the words of the contract, or is final subdivision and site plan

approval required?  The meaning of the phrase "deemed approved" must be understood in

context.  There were two important defined terms: the Litigation and the Submitted Plans.  The

maximum relief Catanzareti could seek in the Litigation was preliminary approval.  He got that.

That approval was for the Submitted Plans, so the parties knew the number, size and

configuration of the lots.  That was important to them because the new pricing structure

negotiated in 2003 would apply.  Also important to both parties, the Submitted Plans had the

maximum number of single family lots (104) remaining under the COAH settlement.[6]  Obtaining

final subdivision and site plan approval required more engineering details, but did not change the

number of lots.  In this context, the Submitted Plans were "deemed approved" when the

judgment granting preliminary approval was affirmed.

The first part of the Paragraph 20.8 presents a challenge to understand because the

alternatives (a), (b) and (c) are in the disjunctive and negative.  (a) contemplates "no final

_____

[5]  In a letter dated September 5, 2007, Pizzo's lawyers called this Catanzareti's "court
victory."

[6]  In Paragraph 20.2, both parties agreed to seek the maximum number of lots.  For
Catanzareti, this would result in the highest purchase price.  For Pizzo, it provided economies of
scale in building homes.

settlement in the Litigation is reached"; (b) envisions "a judgment in the Litigation . . . is not

obtained"; and (c) speaks of "the Litigation is dismissed or otherwise not pursued."  Although

the structure of the sentence is awkward, one can see that the parties attempted to list the

possible ways the Litigation might have ended unsuccessfully for Catanzareti: dismissal, an

adverse judgment, failure to prosecute, failure to settle.  Since Catanzareti received a favorable

judgment, the first part of Paragraph 20.8 does not apply.

Pizzo argues that under Paragraph 20.8(a), since there was no final settlement reached in

the Litigation, he has the right to invoke the $3.5 million price.  That argument ignores

Paragraph 20.8(b) referring to a judgment.  Understanding that the first part of Paragraph 20.8

tries to describe all the possible ways the Litigation might end unfavorably, once Catanzareti

achieved a favorable judgment, the possibility of settlement was moot.  Therefore, Paragraph

20.8 could not provide the basis for Pizzo to buy at the minimum price of $3.5 million.

The court concludes that the second part of Paragraph 20.8 was effective as of March 6,

2007 (Pizzo's proposed closing date).  That meant that the original Paragraphs 1.1.1 through

1.1.4 were replaced by the new 1.1.1 through 1.1.5 recited in Paragraph 20.8.  Also, the first part

of Paragraph 20.8 did not apply since Catanzareti had a judgment in the Litigation.  Thus, the

two sections of the 2003 Contract that refer to a price of $3.5 million (the original 1.1.1 and the

first part of Paragraph 20.8) could not apply on Pizzo's proposed closing date, March 6, 2007,

because Catanzareti had prevailed in the Litigation.

### *Arbitration of Price*

The exchange of lawyers' letters contained a query as to whether Pizzo proposed to pay

the maximum price of $5.2 million and his reply asserting a right to pay only the minimum price

24

of $3.5 million.  Pizzo claims that if Catanzareti disputed the price he was, nevertheless,

obligated to deliver a deed to Pizzo and demand arbitration over the price.  Because Catanzareti

failed to do so, he breached the contract and cannot take the condemnation proceeds, argues

Pizzo.

He neglects to mention that either party could demand arbitration and he failed to do so

as well.  One party is not required to arbitrate unless the other side has made a demand.  In

addition, Pizzo initiated a specific performance action in state court on March 26, 2007, merely

12 days after he first articulated his theory on price.  Catanzareti hardly had time to consider

arbitration before Pizzo jumped into court.  The failure of Catanzareti to deliver a deed and

demand arbitration as to price does not preclude him from relying on Paragraph 11 of the

contract that awards him the condemnation proceeds.

### *Time of the Essence*

Both parties also raise the issue of whether the Pizzo's February 14, 2007,

communication constituted a proper "time of the essence" closing demand.  This letter from

Pizzo's attorney indicated that Pizzo was ready to "waive all of the preconditions except title"

and was "prepared to settle on the 6th day of March, 2007."  Pizzo argues that this was a proper

time of the essence closing demand and because Catanzareti did not promptly close on the

specified date, he breached the contract.  However, Catanzerti counters that he was under no

obligation to close on March 6th because Pizzo's letter did not meet the standards of a time of

the essence demand.

Under controlling New Jersey law, the closing date in a contract for real property is

presumed at equity to be a matter of formality instead of being "essential."  *Marioni v. 94*

25

*Broadway, Inc.*, 866 A.2d 208, 217 (N.J. Super. Ct. App. Div. 2005) (citing *Paradiso v. Mazejy*,

69 A.2d 15, 17 (N.J. 1949)).  A party's inability to meet the closing date will not constitute a

breach of contract and reasonable time for the performance of the contract must be allowed.  *Id.*

However, if a contract expressly provides that time is of the essence, or that such a conclusion is

necessarily implied by the nature and circumstances of the contract, then prompt performance on

the date fixed is essential.  *Paradiso*, 69 A.2d at 17; *see also*, *Orange Soc. of New Jerusalem v.

Konski*, 121 A. 448, 450 (N.J. Ch. 1923).  A court of equity will then strictly enforce the date and

time specified for closing.  *Marioni*, 866 A.2d at 217 (citing *Stamato v. Agamie*, 131 A.2d 745,

748 (N.J. 1957)).  The court finds that the 2003 Installment Purchase and Sale Contract does not

provide that time is of the essence, either by explicit provision, or by necessary inference.

Where the initial agreement does not provide that time is of the essence, a party may still

make time of the essence by a reasonable, formal demand.  *Paradiso*, 69 A.2d at 17; *Marioni*,

866 A.2d at 217.  The demanding party must also give "reasonable notice of the date for

closing," and "the date chosen must bear a reasonable relation to the time already elapsed."  *Id.*

A demand's definitiveness and specificity may be considered when evaluating its

reasonableness.  *Marioni*, 866 A.2d at 217-18.  In *Marioni v. 94 Broadway, Inc.*, the Appellate

Division questioned the reasonableness of a time of the essence demand notice because of "the

absence of detail" in the demand and noted that "contrary to normal practice, [the demand] did

not state a time or place for closing."  866 A.2d at 217-18.  The Appellate Division further

observed:

> Typically, a valid notice, in this context, would use the phrase
> "time of the essence" and unequivocally state the date for closing,
> as here, but it would also state a time and place for closing, terms
> that are absent from Roxy's notice, or else the other party would

26

> not know where or when to arrive for closing. The failure to be as
> definitive as the notice in, for example, *Labash v. Mancini*, 14
> N.J.Super. 116, 118, 81 A.2d 404 (Ch.Div.1951), has the potential
> for raising additional questions as to the sufficiency of an
> attempted performance.

*Id.* In the February 14, 2007 letter, the solely relevant portion read, "In accordance with the

contract, my client will waive all of the preconditions except title and therefore is prepared to

settle on the 6th day of March, 2007." Absent in the alleged demand is a time of closing, a place

of closing, and any affirmative language that the closing must happen on March 6th, including

"time of the essence" language or otherwise. The inadequacy of Pizzo's demand attempt is

similar to the deficient demand criticized by the Appellate Division in *Marioni*. Both leave out

clear time of the essence intent language, a time of closing, and a date of closing.

Furthermore, Pizzo's subsequent conduct and equivocation indicates that he did not

consider the February 14 letter to be demanding time of the essence performance. A follow-up

letter from Pizzo's attorney, dated March 1, 2007, wrote, "my client is willing, ready and able to

conclude this transaction," and asked if Catanzareti was "intending to complete the settlement."

He then asked for a "convenient time on the date stated" or "a rescheduled date as soon as

possible." Pizzo's position in the second follow-up letter is inconsistent with a party requiring

that time be of the essence. Pizzo invited Catanzareti to close with a suggestion of his

forthcomingness instead of affirmatively declaring that he would appear on March 6th, with

money-in-hand, to close. Also, instead of taking the opportunity to lay down a clear, and

unambiguous place and date for closing, Pizzo waffled with both the date and time by asking

27

Catanzareti for his input.[7]

A third letter, dated March 9, 2007, further reveals that Pizzo had not viewed March 6th to be a date of the essence.  In the letter, Pizzo's lawyer wrote, "In that I have not a response to my letter to you dated March 1, 2007, I will infer that your client is not agreeable to settling in accordance with the terms of the Agreement of Sale."  Had Pizzo viewed March 6th to be a closing date of the essence, he could have indicated so by declaring that the March 6th closing date had passed and that Catanzareti's failure to be present for the closing constituted a breach of contract.  Instead, Pizzo completely ignored the lapsed March 6 closing date and treated his letter as an ongoing negotiation of settlement.

Even if the court were to find that Pizzo had intended to close on March 6th and that February 14th letter was a reasonable and effective demand, the aforementioned conduct and equivocation waives any right to time of the essence performance.  New Jersey courts have long held that a closing date made of the essence may be waived by inconsistent conduct, even where time of the essence is made explicit.  *E.g.*, *Kerney v. Johnson*, 144 A. 808, 808-9 (N.J. 1929); *Salvatore v. Trace*, 262 A.2d 409, 413 (N.J. Super. Ct. App. Div. 1969); *see also*, *Norton v Miller*, 47 A.2d 738, 739 (N.J. Ch 1946); *Kobrin v. Drazin*, 128 A. 796, 797 (N.J. Ch. 1925).  Whether by lack of intent or waiver through conduct, the court finds that there no effective demand for time of the essence existed.  However, the court does not consider the time of the essence argument important and the result is not premised on Pizzo's failure to make time of the essence.  It is clear that Catanzareti would not have delivered a deed in exchange for $3.5

---

[7] While the court does not mean to suggest that a demanding party must be unyielding and draconian in the date, time, and place of its demand, any attempt to be accommodating must not introduce confusion and should unequivocally communicate that time is of the essence.

28

million, and the court has determined that he had no obligation to do so.  Therefore, punctuality

is not relevant and the parties' arguments regarding time of the essence are of no consequence.

### *Diligence In Seeking Approval*

Pizzo says Catanzareti breached his duty to diligently prosecute the applications for

governmental approvals and should be precluded from enforcing Paragraph 11.  Frustration at

the ten-year odyssey is understandable, but Pizzo acknowledges that Catanzareti was tortured by

the town.  At one point he complained that Catanzareti did not immediately start the engineering

for final subdivision approval after the state court judgment in November 2004.  However, on

May 24, 2006, Pizzo wrote:   "I was not suggesting that we do anything at all until we have the

decision of the Appellate Court and the approvals of the DEP."

Thereafter, the Appellate Division ruled for Catanzareti in June 2006.  The town withheld

its countersignature for the DEP application until July 2006.  Wetlands and sewer permits were

issued by the DEP on December 22, 2006.  COAH II was decided by the Appellate Division in

May 2007.  After all litigation concluded, Catanzareti had the engineering completed for the

final subdivision application that was filed in August 2007.  The planning board took until

January 2008 to vote its final approvals.  By that time, the condemnation proceeding had been

filed in state court.

The only inkling that Catanzareti might have delayed the approval process to see how

condemnation played out came in a letter to Pizzo's attorney from Catanzareti's lawyer dated

April 4, 2007.  He wrote:

> My client has not filed for subdivision/site plan approval for a
> variety of reasons, including the Borough's steady acceleration of
> the process of condemning the property . . . .  I should add that I
> am informed that a Borough Council meeting recently took place

at which the council authorized bonding for $8.3 million to fund
the condemnation.

Of course, this letter was written after Pizzo had initiated his specific performance suit in

state court.  Also, the town did not raise the money for more than a year after this letter was

written.  In any event, the delay was short lived.  Catanzareti filed his application in August

2007.

The court finds that Catanzareti did not breach his duty to prosecute the governmental

approvals.  To the contrary, Catanzareti tenaciously persisted in spite of unrelenting opposition

by the town and through the exhaustion of his resources.  This is no basis to preclude him from

relying on Paragraph 11.

### *Payment of Taxes*

Catanzareti did not timely pay the taxes on the property in 2005 and 2006.  The town sold

tax sale certificates to a third party in December 2006.  Although a municipal ordinance

permitted the town to decline to review development applications for properties with delinquent

taxes, it did not do so after Catanzareti filed for final major subdivision and final site plan

approval in August 2007.

Pizzo claims that the failure to pay taxes was a breach of contract and either (i) caused a

delay in the approval process or (ii) is evidence that Catanzareti purposely delayed seeking

approvals in the hope that the town would condemn the property.

On the first point, the court finds that the failure to pay the taxes on time had no impact

on the approval process.  Pizzo agreed that the applications for final approvals need not be filed

until the Appellate Division ruled and the DEP issued permits.  That did not happen until

December 2006.  By that time, the taxes had been paid by a third party purchaser of the tax sale

certificates.  The town would not, and did not, refuse to hear the applications because of

delinquent taxes.

On the second point, Catanzareti's failure to pay taxes in 2005 and 2006 was a conscious

decision to reserve scarce resources for other development costs.  It had nothing to do with any

attempt to delay in anticipation of condemnation.  The earliest evidence that Catanzareti gave

even minimal credence to the town's condemnation ploy was February 2007 when the town's

lawyer made a written offer to purchase at the lower appraised value.  Of course, that offer was

subject to the town's ability to finance the purchase, which Catanzareti considered highly

unlikely.  The late payment of taxes does not support Pizzo's theory that Catanzareti delayed

seeking approvals because he hoped the town would condemn.

### *Notice of Comdemnation*

Paragraph 11 of the contract requires Catanzareti to notify Pizzo of any "proceeding or

action" for condemnation.  Pizzo complains that he was not told about the letters from the town's

lawyers proposing negotiations to buy the property or meetings with the appraisers or town

officials to informally discuss condemnation.  Pizzo maintains that if he had early notice of the

town's overtures he could have dissuaded the town from condemning the property.

Catanzareti counters that the contract requires notice of "proceeding or action" which is a

term of art under the Eminent Domain Act referring to a formal declaration of taking or

commencement of a condemnation suit in state court.  The first formal proceeding or action was

the Complaint filed by the town in state court on September 5, 2007.  Since Pizzo was a party to

the suit, he was served with the complaint.  He unsuccessfully argued that the town did not have

the right to condemn the property and then withdrew his appeal of the unfavorable ruling.

31

The court agrees with Catanzareti's interpretation of the contract. "Proceeding or action" for condemnation envisions a formal step under the state Eminent Domain Act. Under paragraph 11 (see footnote 1), Catanzareti was obligated to give Pizzo notice only if a formal proceeding or action was initiated. He did not have to give notice of every letter or meeting with the town at which informal or consensual acquisition was broached by the town. Also, Pizzo was aware from 1998 onward that the town "contemplated" condemnation. Catanzareti did not breach his obligation under paragraph 11 to give notice of condemnation.

Assuming (without accepting) that Pizzo was entitled to notice of informal overtures regarding condemnation, and that a proper reason for the notice includes an opportunity to prevent condemnation, the court finds that the earliest event requiring notice was the letter from the town in April 2006 scheduling a site inspection by the appraisers. That meeting coincided with the bond ordinance appropriating the woefully inadequate amount of $979,000 to acquire the property. Understandably, no one took the condemnation threat seriously at that time. Pizzo's ignorance of that meeting did not materially impact his campaign to convince the town not to take the property. By the Fall of 2006, Pizzo was aware of the $8 million value reported in the paper and suspected Catanzareti of waivering loyalty. By early 2007, Pizzo allied himself with a vocal citizens group opposed to condemnation. He had private meetings with the Mayor and other town officials at which he made his case against condemnation. He cooperated in making the anti-condemnation video, prepared drawings showing alternative development schemes, and advocated against condemnation at a public meeting. He had ample opportunity to make his case from the Fall of 2006 through September 2007 when the condemnation complaint was filed. Even thereafter, until the declaration of taking in May 2008, he had ample

32

opportunity to convince either the town officials or the courts that condemnation was not appropriate.  His efforts were unavailing.

Furthermore, it is significant that the town elected a new mayor in 2007.  The former Mayor had been in office all during the Phase II approval process and was openly hostile to it. Pizzo would concede that dissuading him from any action would be difficult.  The new administration starting in 2007 took a fresh look at Phase II and professed having an open mind. Pizzo took his best shot at preventing condemnation and missed.  Pizzo should not be entitled to the condemnation proceeds that he tried vigorously, but in vain, to prevent.

### *Final Approval*

Pizzo argues that Catanzareti should have offered to convey the deed to him for $4,635,000 after the planning board voted to grant final subdivision and site plan approval in January 2008.  Pizzo neglects to mention some crucial facts.  First, Pizzo never demanded a closing after the planning board vote and never communicated his willingness to pay $4,635,000. Secondly, the town had filed its condemnation complaint in September 2007 and the state court had denied Pizzo's motion to dismiss.  Thirdly, Catanzareti filed a petition in bankruptcy on January 27, 2008.  Pizzo had an executory contract.  He never moved under 11 U.S.C. § 365(d)(2) to force Catanzareti to assume or reject prior to confirmation of the plan.  Lastly, the planning board never issued a resolution memorializing its vote so the administrative proceeding was not complete.

### CONCLUSION

The contract allocates the condemnation proceeds to the Seller (Plaintiff/Debtor/Catanzareti).  The court rejects Defendant (Pizzo/Buyer)'s argument that

33

Plaintiff should be precluded from relying on the contract because:

1. Breach of a duty to transfer title at $3.5 million.

2. Failure to dilgently prosecute applications for government approvals.

3. Failure to give notice of informal condemnation proceedings.

Plaintiff shall have a judgment declaring that all condemnation proceeds belong to him.

Defendant's unsecured claim is disallowed.


Dated: March 6, 2009                    **/S/Raymond T. Lyons**
                                        United States Bankruptcy Judge